**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| David Charles Foote, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 6300 |
| | ) | |
| v. | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MICHAEL T. MASON, United States Magistrate Judge.

Claimant David Charles Foote ("Foote" or "claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Foote's claim for Disability Insurance Benefits under Sections 216(i) and 223 of the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i) and 423. The Commissioner filed a cross-motion for summary judgment requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is denied and the Commissioner's cross motion for summary judgment is granted.

**I. Background**

    **A.    Procedural History**

Foote claims that he suffers from a neck injury as a result of an accident at work

on May 3, 2002.  (R. 237.)  His date last insured was December 31, 2007.  (R. 163.)  He

filed an initial application for Disability Insurance Benefits ("DIB") on July 20, 2004.  (R.

101-04.)  This application was denied on September 3, 2004 and claimant never

appealed.  (R. 45-46.)  On January 3, 2007, Foote filed a second application for DIB,

which is the subject of this appeal.  (R. 109-15.)  On April 12, 2007, the second

application was denied.  (R. 47, 54-58.)  Foote filed a timely request for reconsideration

on April 20, 2007, which was denied on June 19, 2007.  (R. 48, 59-63.)  Claimant filed a

hearing request on June 26, 2007, and a hearing was held September 17, 2009.  (R.

21-44, 65.)  On October 23, 2009, the ALJ denied Foote's request for DIB.  (R. 8-20.)

Foote filed a timely request for review on November 10, 2009, which was denied by the

Appeals Council on August 12, 2010, making the ALJ's decision the final decision of the

Commissioner.  (R. 1-7); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001); 20

C.F.R. § 416.1481.  Foote subsequently filed this appeal.

### B.     Medical Evidence

### 1.     Dr. Donald W. Piller

On May 3, 2002, the date of his accident, Foote sought treatment from a

chiropractor, Dr. Donald W. Piller.  (R. 237.)  A few days later, on May 8, 2002, Dr. Piller

diagnosed Foote with whiplash, subluxation 7C, and brachial radicullitis.  (R. 238.)  Dr.

Piller noted that Foote was slowly responding to chiropractic care, and he released

Foote to return to work.  (R. 238, 240.)  Claimant continued treatment with Dr. Piller

over the next several weeks, during which time he complained of difficulty sleeping, left

arm pain, limited range of motion, occasional burning sensation in the left elbow, and

stiffness.  (R. 235.)  Dr. Piller referred claimant to Dr. George E. DePhillips, a

neurologist, on June 10, 2002.  (*Id.*)

### 2.    Dr. George E. DePhillips

Dr. DePhillips began treating Foote for his injury beginning on June 19, 2002,

and he continued to treat him through 2009.  (R. 269.)  On June 29, 2002, Dr. DePhillips

noted that Foote complained of "pain in the left side of his neck radiating into his left arm

and forearm with numbness and tingling in the second, third and fourth digits of his left

hand." (R. 241.)  Dr. DePhillips noted that a neurological examination revealed mild

triceps weakness in the left upper extremity and a diminished left triceps reflex

compared to the right.  (*Id.*)  Dr. DePhillips suspected a herniated disk at C6-C7 or C5-

C6 level.  (*Id.*)

On August 14, 2002, Foote saw Dr. DePhillips and reported that his neck and left

arm pain had improved.  (R. 267.)  Dr. DePhillips recommended physical therapy for

cervical modalities and strengthening exercises to help relieve claimant's pain.  (*Id.*)  Dr.

DePhillips released claimant to light duty work and stated that claimant is "not capable

of doing his normal job at this point in time." (*Id.*)  On August 28, 2002, Foote returned

to Dr. DePhillips for a follow up appointment and complained that his neck pain radiated

to both extremities, more so in the left arm and forearm.  (*Id.*)  He also stated that his

pain had worsened over the past few weeks, which claimant attributed to physical

therapy.  (*Id.*)  As a result, Dr. DePhillips discontinued physical therapy and ordered a

series of cervical epidural steroid injections.  (*Id.*)

On November 13, 2002, Dr. DePhillips noted that Foote continued to complain of

neck pain and arm pain, especially on the left side.  (*Id.*)  He also complained that his

3

fingers were numb at times. (*Id.*) He was not working at the time. (*Id.*) Dr. DePhillips prescribed Vicodin and noted that Foote stated that Tylenol makes him "wired" and Darvocet causes nausea. (*Id.*)

Foote returned to Dr. DePhillips on February 26, 2003. (R. 268.) At this appointment, Foote stated that he continued to suffer from neck pain and stiffness, and pain radiating to his left arm. (*Id.*) Dr. DePhillips reported that he had recommended cervical epidural steroid injections, but that Foote's worker's compensation insurance was disputing the injury and refused to pay for any pain injections. (*Id.*) The report stated that Foote was working with a lawyer in order to resolve this issue. (*Id.*)

On August 3, 2003, Dr. DePhillips summarized claimant's recent visits in a letter to Foote's attorney. (R. 265-66.) Dr. DePhillips described claimant's chief complaint as neck pain that radiates into the left upper extremity with paresthesia in the second, third, and fourth digits of the left hand. (R. 265.) He also stated that a neurologic exam on June 19, 2002 revealed mild weakness of the left triceps motor group and left triceps reflex when compared to the right. (*Id.*) Dr. DePhillips detailed the results of a cervical spine ("c-spine") MRI, which showed mild degenerative disc disease with slight posterior disc bulging and protrusion at all levels from C3-C7. (*Id.*) The MRI showed no significant mass effect on the spinal cord or existing nerve root. (*Id.*) Dr. DePhillips further noted that he had placed Foote on light duty, that claimant continued to complain of pain at each visit, and that on one occasion his pain was described as a 3-4 out of 10. (R. 265-66.) Dr. DePhillips drafted a second letter to Foote's attorney after he examined Foote on August 28, 2003. (R. 264.) In this letter, Dr. DePhillips stated that Foote continued to complain of worsening neck and shoulder pain radiating to the right

arm and forearm and that a recent MRI revealed protruding discs at C5-C6. (*Id.*)

Foote again returned to Dr. DePhillips on October 9, 2003 with continued complaints of neck and shoulder pain with numbness and tingling in both extremities. (R. 261.) At this appointment, Dr. DePhillips gave claimant refills on pain medications and noted that Foote could not pay for his medical treatment because his group insurance had lapsed and his worker's compensation insurance was denying the claim. (*Id.*) Dr. DePhillips also stated that another doctor, Dr. Skaletsky, had seen claimant and believed that Foote did not suffer from discogenic pain, but rather a muscle sprain that should have improved. (*Id.*)

On October 22, 2003, Dr. DePhillips sent another letter to claimant's attorney. (R. 262-63.) In this letter, he clarified his previous narrative and stated that he had reviewed the records of Dr. Donald Piller, a chiropractor, and discovered that Dr. Piller had been treating claimant intermittently for the past twenty years for cervicalgia and cervical torticollis. (R. 262.) However, Dr. DePhillips noted that prior to the work injury, Foote had not seen Dr. Piller for several years. (*Id.*) Dr. DePhillips stated that Foote had "radiographic signs on the MRI scan of disk bulging and degeneration as well as bone spurring or osteophyte formation." (*Id.*) Therefore, Dr. DePhillips opined that Foote's work injury has "caused permanent exacerbation of his cervical spondylosis." (*Id.*) He stated that claimant should remain off work, and he concluded that Foote's condition would require further treatment. (R. 263.)

Foote next returned to see Dr. DePhillips on February 12, 2004. (R. 261.) He continued to complain of neck and shoulder pain with bilateral arm pain and numbness and tingling, rating his pain at times as a 9 out of 10. (*Id.*) Foote explained to Dr.

5

DePhillips that he had not yet completed the discogram because his worker's compensation insurance had not yet approved it and that his attorney was working on getting his medical bills paid.  (*Id.*)

On August 2, 2004, Dr. DePhillips completed an Illinois Bureau of Disability Form for claimant.  (R. 258-59.)  Dr. DePhillips stated that Foote complained of pain on the left side of his neck and in his left arm and forearm, and of numbness and loss of sensation in digits two, three and four on the left hand.  (R. 258.)  However, Dr. DePhillips also noted in this form that he had performed no physical tests for tenderness, weakness, reflex changes or sensory changes and whether Foote suffered from nerve root compression was unknown at this time.  (*Id.*)  He further noted that no tests had been performed to determine atrophy or range of motion of the spine.  (*Id.*)  Dr. DePhillips stated that Foote may need an assistive device because his ambulation was not normal due to back pain.  (*Id.*)  He also noted that claimant was able to stand or walk for 15-minute intervals, needed to change position (for 10-20 minutes) more than once every 2 hours, and was restricted to lifting and carrying not more than 10 pounds. (R. 259.)

On September 23, 2004, claimant continued to complain of neck and shoulder pain and numbness in both extremities.  (R. 260.)  On this date, Dr. DePhillips noted that a recent MRI revealed disk protrusions at multiple levels.  (*Id.*)  He recommended that Foote undergo surgery "in the form of spinal fusion," but that claimant would first need to complete a cervical discogram and a follow up MRI.  (*Id.*)  Dr. DePhillips released Foote to do sedentary work with light physical activity.  (*Id.*)

Dr. DePhillips did not see Foote again until July 14, 2005, when Foote continued

with the same pain complaints. (R. 416.) On this visit, Dr. DePhillips reiterated his recommendation that claimant undergo a discogram in order to determine the source and the levels of his pain. (*Id.*) He also ordered a follow up MRI. (*Id.*)

Dr. DePhillips saw Foote again on August 18, 2005. (*Id.*) Foote had his follow-up MRI scan of his cervical spine, which revealed degenerative disc disease at multiple levels. (*Id.*) He also noted a herniated disc at the C6-C7 level. (*Id.*) Foote's discogram revealed concordant pain at the C4-C5, C5-C6 and C6-C7 levels. (R. 415.) Dr. DePhillips believed his best surgical option was a four level cervical spinal fusion at levels C3-C7. (*Id.*)

On November 22, 2005, Foote was admitted to Community Hospital of Ottawa for his surgery. (R. 289-92, 443-46.) Just prior to surgery a history and physical exam was performed, in which Dr. DePhillips reported that cranial nerves two through twelve were intact, Foote's motor strength was within normal limits, his sensory examination was intact to pinprick, his deep tendon reflexes were symmetrical, and his gait and cerebellar exam were unremarkable. (R. 287-88.) A subsequent exam and x-ray on January 12, 2006 revealed that Foote was recovering "reasonably well" and showed "good position of the interbody cages"; however, claimant continued to report neck pain and burning in his shoulders. (R. 415.)

Foote returned to Dr. DePhillips for another follow-up appointment on March 9, 2006. At this appointment, Dr. DePhillips reported that Foote was doing reasonably well except for neck discomfort and loss of cervical mobility. (R. 415.) Dr. DePhillips stated that the fusion appears to be "taking well" and that Foote should begin physical therapy. (*Id.*)

7

Dr. DePhillips examined Foote again on April 13, 2006 and again reported that Foote was doing reasonably well, but continued to have neck pain and headaches. (R. 413.) Dr. DePhillips concluded that the physical therapy did not seem to be giving claimant strength or relief from his pain, however, claimant was to continue with the therapy and remain off work until his next appointment. (*Id.*) Dr. DePhillips also recommended a CT scan in order to assess the fusion. (*Id.*) This was performed on May 1, 2006 and revealed good anatomical alignment with mild degenerative changes, as well as mild to moderate neural foraminal stenosis at the C4-C5 and C5-C6 levels on the left. (R. 422-23.) Dr. DePhillips noted that no solid fusion was visible in the scan, and as a result, he modified Foote's therapy for four weeks. (R. 413.)

A follow-up CT of the c-spine was performed on August 22, 2006, which showed no significant interval change. (R. 424-25.) Dr. DePhillips noted that this scan showed a "potential psuedoarthrosis and lack of fusion." (R. 413.) At a subsequent follow-up visit on September 28, 2006, Dr. DePhillips noted that the most recent x-ray showed "good fusion at all levels with [the] exception perhaps of the C3-C4 level." (*Id.*) Dr. DePhillips stated that Foote continued to complain of residual neck pain and numbness radiating down both extremities. (R. 413.) Dr. DePhillips declared that Foote was totally disabled and unable to carry out meaningful employment. (*Id.*) Dr. DePhillips recommended waiting another 3-6 months and then reassessing claimant's condition before exploring the possibility of revising the fusion. (*Id.*)

Another CT of the c-spine was performed on November 29, 2006. (R. 409.) This scan revealed slight marginal spurring in a right paramedian to right lateral location at the C3-C4 level and the left paramedian location at C5-C6, but showed no evidence of

8

significant encroachment on the spinal canal or neural foramina, and no malalignment. (*Id.*)  Further, no bone destruction or significant soft tissue encroachment on the spinal canal was noted.  (*Id.*)

Claimant was again seen on November 30, 2006.  At that time, Dr. DePhillips noted that Foote continued to complain of neck pain, headaches, and bilateral upper extremity pain.  (R. 411, 471.)  Dr. DePhillips stated that the CT scan revealed that "the interbody fusions appear[ed] to be taking well at all levels" and there was "no evidence of pseudoarthrosis."  (*Id.*)  Dr. DePhillips opined that claimant had "lost significant cervical mobility," "was permanently and totally disabled" and "not capable of performing meaningful employment."  (*Id.*)  Dr. DePhillips provided Foote with a disability certificate indicating that he was to remain off work for approximately three months.  (R. 412.)

On March 2, 2007, claimant returned to Dr. DePhillips for a follow-up visit with the same complaints of pain and occasional headaches, as well as burning in both upper extremities with associated numbness and tingling.  (R. 471.)  He rated his pain a 7 out of 10.  (*Id.*)   After reviewing x-rays of Foote's spine, Dr. DePhillips opined that "interbody fusions appear to have solidified" and he believed that Foote's persistent nerve root symptoms represented permanent nerve damage that occurred as a result of the injury.  (*Id.*)  Once again, he opined that Foote was permanently disabled and unemployable.  (*Id.*)  Dr. DePhillips noted that Foote did apply for disability benefits and that his application was pending.  (*Id.*)

Dr. DePhillips saw Foote again on May 31, 2007.  Dr. DePhillips noted that Foote continued to complain of neck pain, burning, and headaches.  (R. 465-66.)  At this time, Dr. DePhillips prescribed Norco, Ambien, Flexeril, Neurontin, and Valium.  (R. 466.)

Dr. DePhillips also prescribed Oxycontin because Foote complained of difficulty sleeping. (R. 465.) Dr. DePhillips opined that claimant's condition has worsened, possibly due to failed fusion at C3-C4 and that he may need to undergo a revision. (*Id.*) He ordered a CT scan to further assess the fusion. (*Id.*)

On August 7, 2007, Foote underwent a Key Functional Assessment ("FCA"), the results of which were provided to Dr. DePhillips. (R. 482-83.) According to the FCA, Foote was able to perform work at a light activity level. (R. 482.) The report noted that Foote was not capable of resuming his previous employment as a truck driver, which is typically considered a medium physical demand level position. (*Id.*) The FCA recommended a 4-6 week work conditioning physical therapy program in order to increase strength and endurance, activity tolerance and overall functional abilities, while decreasing subjective pain reports. (*Id.*) Claimant was found to be capable of occasionally lifting 25 pounds and frequently lifting 11 pounds. (R. 484.) Claimant was also found to be able to sit and stand for 3 to 4 hours per day for 30 and 40 minute intervals respectively, as well as walk for 3 to 4 hours, for a total workday of 8 hours. (*Id.*) Foote was able to occasionally bend, stoop, squat, crawl and crouch, and frequently climb stairs, kneel and balance. (R. 484.) Additionally, Foote was able to frequently grasp with both hands, but minimally flex and rotate his head and neck. (*Id.*) The report noted that throughout the assessment, Foote had "numerous subjective pain reports/behaviors with virtually every aspect." (R. 422.)

Foote returned to Dr. DePhillips on October 26, 2007. (R. 513.) Dr. DePhillips reiterated his opinion that claimant was unemployable, but referred to the Key Functional Assessment recommendation for a work conditioning program. (*Id.*) Dr.

DePhillips stated that he was not opposed to work conditioning, as long as claimant had three weeks of conventional therapy for stretching and strengthening exercises. (*Id.*) His notes also indicate that the FCA recommended that Foote be weaned off of his pain medications. (*Id.*) Dr. DePhillips refilled Foote's pain medications and stated that he would consider a work conditioning program. (*Id.*) He subsequently transferred pain management responsibilities for claimant to Dr. Sharma. (*Id.*)

On December 7, 2007, Foote again returned to Dr. DePhillips and stated that he had resumed therapy, but after six sessions his pain worsened. (R. 512.) Dr. DePhillips discontinued claimant's therapy, and opined that Foote would not be able to tolerate work conditioning. (*Id.*) Dr. DePhillips released Foote with permanent restrictions including: total sitting/standing time durations of four hours per day; occasionally lifting up to 20 pounds and frequently lifting up to 10 pounds or less; sitting and standing for 20-30 minute durations with a 5-10 minute change of position; and no climbing or repetitive bending, twisting, or stooping. (*Id.*) Dr. DePhillips opined that "[b]ased on these restrictions it is my opinion that he is unemployable and should consider social security disability." (*Id.*)

Foote did not see Dr. DePhillips again until June 20, 2009 after Foote was involved in a car accident. At this time, Foote complained of worsening neck pain after his car was rear-ended. (R. 502.) Dr. DePhillips also examined Foote on July 20, 2009, and opined that the CT scans revealed "solid interbody fusion [at] C6-C7" and "a failed fusion at the C3-C4 level with a fracture of the C3 cancellous screws." (R. 501.) It should be noted that these medical visits occurred after Foote's date last insured, which was December 31, 2007.

11

### 3.    Physical Therapy

Pursuant to Dr. DePhillips' orders, claimant began physical therapy on August 20, 2002.  (R. 217.)  According to the therapy notes, Foote's chief complaint was left side pain of the upper back with burning through the fingers on his left hand.  (R. 319.)  On August 22, 2002, the therapist noted that Foote experienced "constant pain in left arm" and his tolerance was "fair."  (R. 317.)

Foote resumed physical therapy in March of 2006.  (R. 377.)  In his initial evaluation, Foote reported burning in the bilateral upper extremities, continued numbness and tingling down both arms, and numbness in the right c-spine area, and that his pain can be as high as 8-9 out of 10.  (*Id.*)  Claimant reported that he had difficulty doing things around the house, and doing any overhead activity, such as lifting or carrying objects.  (*Id.*)  The therapist noted that claimant had functional upper cervical spine flexion, extension, and rotation.  (*Id.*)

Foote's physical therapist continually updated Dr. DePhillips on Foote's progress. (R. 372-76.)  On March 27, 2006, he noted that Foote is "gaining improved shoulder mobility, decreased symptoms to bilateral arms," and "reports that he has numbness or tingling in the left hand and decreased numbness and tingling to the right as compared to his initial evaluation..."  (R. 376.)  He also noted that Foote was "tolerating therapy well with the flexibility exercises."  *(Id.)*

On March 31, 2006, Foote's therapist noted that range of motion exercises seemed to increase the tingling in both hands.  (R. 375.)  As a result, he opted to refrain from these exercises until Foote's symptoms subsided again.  *(Id.)*  On April 11, 2006, the therapist provided a similar report, and noted that Foote's "progress had been slow,"

but "as the symptoms begin to subside, we will again attempt to improve strength and endurance to within tolerable levels." (R. 374.) On April 28, 2006 and again on May 5, 2006, the therapist noted a "decline in progress" and an increase in Foote's symptoms. (R. 372-73.)

### 4. Dr. Aftab Khan

Dr. Aftab Kahn ("Dr. Kahn"), a consultive examiner from the Illinois Department of Rehabilitation, examined Foote on August 18, 2004. (R. 242-48.) Foote reported a constant dull aching neck pain radiating to both upper extremities, which increased with movement and activity and slightly decreased with pain medication and rest. (R. 242.) Foote also complained of associated tingling and numbness, but denied any other complaints. (*Id.*) Claimant reported that he was currently taking Flexeril and Vicodin for pain. (R. 243.)

On physical exam, Dr. Kahn noted no anatomical abnormalities or limitation of motion in the upper extremities. (R. 244.) He noted further that Foote's grip strength was strong and equal bilaterally. (R. 245.) Dr. Kahn's neurologic exam was normal, with cranial nerves two through twelve intact. (*Id.*) Foote's deep tendon reflexes, biceps, triceps, and brachioradialis were all 2+ and equal bilaterally. (*Id.*) Claimant's sensory examination was also normal with pinprick sensation in both upper extremities. (*Id.*)

Foote's spinal examination revealed mild limitation of motion in the c-spine area, but no anatomical abnormalities and no muscle atrophy. (*Id.*) Dr. Kahn found that forward flexion of thoracic and lumbar spine was accomplished to 70 degrees. (*Id.*) Examination of the c-spine revealed forward flexion to 30 degrees, extension to 30

degrees, lateral flexion to 30 degrees, and rotation to 70 degrees.  (*Id.*)

Dr. Kahn found that Foote was able to walk fifty feet without an assistive device and without limping and he was able to lift five pounds, but not carry it because of the associated neck pain.  (*Id.*)  All fine motor movements were found to be normal.  (*Id.*)  Foote had no difficulty with squatting and rising, getting on and off the table, walking on toes and heels or hopping on one leg.  (*Id.*)

### 5. Illinois Valley Community Hospital Emergency Room

On December 20, 2004, at 1:36 AM, an ambulance was dispatched to a local bar because the bar owner reported that claimant had fallen off his bar stool, hit his head, and was unresponsive.  (R. 333, 339.)  Upon arrival, the emergency medical technicians ("EMTs") discovered claimant conscious, lying on the floor holding his neck, bleeding from the back of his head, "combative", and smelling of alcohol.  (R. 333.)  Witnesses stated that Foote was sitting on bar stool and fell backward.  (*Id.*)  The EMTs placed claimant on a backboard with a collar to immobilize his neck; however, claimant continuously tried to pull the collar off.  (*Id.*)  Foote was unable to remember what happened or where he was.  (R. 333-34.)

Foote was taken to the emergency room at Illinois Valley Community Hospital where he was found to be very belligerent and eventually pulled the neck collar off.  (R. 339.)  Claimant denied any neck pain, tingling, numbness or weakness, and had strong hand grasps.  (*Id.*)  He also reported that he had no point tenderness over his cervical, thoracic, or lumbar spine.  (R. 339-40.)  The report stated that "the patient is without problem."  (*Id.*)  A CAT scan of his brain was performed and was found to be otherwise unremarkable.  (R. 342.)

### 6.    Dr. Michael Malek

Prior to his spinal fusion with Dr. DePhillips, Foote was referred to Dr. Malek for a surgical consultation on October 5, 2005.  (R. 440-42.)  Claimant reported pain in his neck down to his fingers, along with tingling, numbness, and weakness.  (R. 440.)  Foote did not report any mid or low back pain, or headaches.  (*Id.*)  Dr. Malek reported that Foote had received cortisone injections and physical therapy, and was currently taking Vicodin and Flexeril for pain.  (*Id.*)  On physical examination, claimant was found to have a moderately restricted range of motion.  (*Id.*)  No motor, sensory, or reflex deficits were found; however, Dr. Malek did state that claimant's reflexes were hypoactive.  (*Id.*)  Dr. Malek reviewed Foote's MRIs and concluded that Foote had neck and upper extremity symptoms consistent with multi level pathology with discogenic pain at C4-C7.  (*Id.*)  After discussing the various options for Foote, Dr. Malek reported that claimant would not be able to return to "heavy work" after the surgery.  (R. 442.)

Foote followed up with Dr. Malek on August 24, 2006.  (R. 414.)  Foote reported intermittent pain with weather changes and that he did not tolerate physical therapy well.  (*Id.*)  Dr. Malek stated that the fusion was "not as solid as one would expect at this point."  (*Id.*)

### 7.    Dr. Phillip S.  Budzenski

Foote saw Dr. Phillip Budzenski ("Dr. Budzenski") for a consultive examination on March 21, 2007.  (R. 452-56.)  Dr. Budzenski reported that Foote drove himself to the exam.  (R. 452.)  He also noted that claimant reported "doing well enough that he took a vacation to Cozumel, Mexico."  (*Id.*)  Foote reported that he was taking Valium, Vicodin,

15

Flexeril, Neurontin, and Ambien.  (R. 453.)  Claimant continued to report pain,  burning and numbness from his neck to his fingertips.  (R. 452.)  Foote stated that he was able to perform basic activities of daily living, and Dr. Budzenski stated that Foote showed no signs of personal hygiene neglect and had no trouble walking or getting on and off of the examination table.  (R. 453.)  Further, Dr. Budzenski stated that Foote was able to bend over and attend to his footwear without any difficulty, and appeared stable and comfortable in both seated and supine positions.  (*Id.*)

Dr. Budzenski's examination of claimant's c-spine revealed no tenderness in spinous processes or paravertebral muscle spasm; Foote's flexion was limited to 20 degrees, extension limited to 5 degrees, lateral bend to right was limited to 10 degrees and left to 5 degrees, and rotation limited to 10 degrees bilaterally.  (R. 454.)  Forward lumbar flexion was limited to 75 degrees, extension normal at 25 degrees, lateral bend at 25 degrees bilaterally, straight leg raise was normal at 90 degrees in both seated and supine positions.  (*Id.*)

An examination of Foote's hands revealed that he was able to close all of his fingers, make a fist, pick up coins, and button clothing.  (R. 455.)  Additionally, Foote reported that he was able to write with his right hand, was found to have no atrophy, and his grip strength rated 5 out of 5.  (*Id.*)  A neurological exam revealed that Foote's reflexes were brisk and symmetrical.  (R. 455.)  Claimant's sensations were intact to touch, vibration, and pinprick.  (*Id.*)  Brachioradialis, triceps, and biceps reflexes were found to be 2+ out of 4, as were patellar and Achilles reflexes.  (*Id.*)  Motor strength was normal and rated 5 out of 5.  (*Id.*)

Dr. Budzenski concluded that Foote should not perform any duties requiring the

16

movement of his c-spine. (R. 456.) Additionally, he would restrict claimant to no climbing of ladders, ropes, or scaffolding. (*Id.*) Dr. Budzenski noted that Foote should otherwise be able to perform at least light duty work for 8 hours a day with occasional medium work. (*Id.*)

### 8. Dr. Alexander J. Ghanayem

Claimant saw Dr. Alexander Ghanayem ("Dr. Ghanayem"), a spinal surgeon, on three separate occasions. (R. 494-99.) On the first visit, June 29, 2006, Foote claimed that his pain was worse following surgery and that he had not experienced any relief after twelve weeks of physical therapy. (R. 498.) Foote reported that he was taking Vicodin, Valium, Flexeril, Ambien, and Percocet, and that he was experiencing neck pain bilaterally with referral to both arms. (*Id.*) Dr. Ghanayem's exam revealed a well-healed vertical scar on the right side of Foote's back. (*Id.*) He noted that Foote experienced tenderness in the paracervical region and tightness in all directions, with no focal motor deficits. (*Id.*) Dr. Ghanayem further found that Foote experienced decreased sensation in both forearms into ulnar border and that his reflexes were 1+ throughout. (*Id.*) Dr. Ghanayem opined that Foote underwent an ill-advised anterior cervical discectomy and fusion and that the discogram that was the basis for the surgery was interpreted incorrectly and should not have served as a basis for surgical intervention. (R. 499.) He stated that he found Foote to be temporarily disabled and stated that once Foote's pain was controlled, claimant could return to light to light-medium duty work with no overhead work. (*Id.*)

Foote returned to see Dr. Ghanayem on June 22, 2007 and reported that his pain was the same. (R. 496.) Claimant indicated that he stopped taking his medications

17

(Norco, Ambien, Flexeril, Neurontin, Valium, and Oxycontin) in the hopes that it would help him stop smoking. (*Id.*) Dr. Ghanayem found continued c-spine tenderness and normal motor functions, with diminished sensation bilaterally. (*Id.*) He opined that Foote had reached his maximum medical improvement. (*Id.*)

Dr. Ghanayem reevaluated claimant on May 8, 2008. (R. 494.) Dr. Ghanayem stated that "not much" had changed since the initial evaluation. (*Id.*) Foote reported that he was off most of his medications except Aleve. (*Id.*) Claimant's symptoms had not changed with regard to residual neck and arm pain, and he still experienced tenderness and tightness in his c-spine with a limited range of motion secondary to pain and tightness. (*Id.*) Both the upper extremity and neurologic exam were normal with respect to motor function. (*Id.*) Dr. Ghanayem stated that he had reviewed the functional capacity evaluation, which allowed Foote to lift "up to 20 pounds on a maximal basis." (*Id.*) He opined that there was no reason to limit Foote to a four-hour workday - eight hours was acceptable. (*Id.*) He also again opined that claimant had reached his maximum medical improvement. (*Id.*)

### 9. Dr. Gary Koehn

On September 6, 2005, claimant was referred to Dr. Gary Koehn ("Dr. Koehn") by Dr. DePhillips for a pain management consultation and a discogram. (R. 431-33, 438-39.) In his notes, Dr. Koehn stated that Foote described "constant, variable, aching, mild to severe" pain in his neck, shoulders, and upper back with some numbness in both hands at times that failed to improve with medication or physical therapy. (R. 438.) Claimant was unable to identify any factors that made him feel better; however, he stated that sitting and some neck movements did aggravate his

18

pain. (*Id.*) A physical exam revealed slight cervical flexed positioning, and decreased range of motion of the cervical spine in all directions with a little more with the left sided movements. (*Id.*) Tenderness was found in the bilateral mid low cervical paraspinous region and upper trapezius groups. (*Id.*) Motor and sensory exams revealed deep tendon reflexes that were symmetric throughout both upper extremities with the exception of cold sensory loss in the right thumb. (*Id.*)

The September 16, 2005 follow-up exam results were similar. (R. 433.) During the discogram, Dr. Koehn noted that claimant's verbal complaints and the disc morphology matched quite well, and that claimant was an "accurate and reliable reporter." (R. 431-32.)

### 10. Dr. Towfig Arjmand

On April 9, 2007, Foote saw Dr. Towfig Arjmand ("Dr. Arjmand") who performed a residual function capacity ("RFC") test. (R. 457-64.) Dr. Arjmand concluded that, according to the test, claimant was able to occasionally lift 20 pounds and frequently lift 10 pounds. (R. 458.) Foote was able to stand, sit, and/or walk, with normal breaks, for six out of eight hours in a workday, with an unlimited ability to push and pull. (*Id.*) Dr. Arjmand limited claimant to occasional climbing of ramps and stairs, as well as balancing, stooping, kneeling, crouching, and crawling, but was never to climb ropes, ladder, or scaffolding. (R. 459.) He noted no other additional limitations. (R. 460-61.)

### C. Claimant's Testimony

At the time of the hearing, Foote was 49 years old, 5 feet 11.5 inches tall, and weighed 215 pounds. (R. 25.) Foote is not married, and he has lived alone for 10

years. (*Id.*) His home is one level, with four stairs. (*Id.*) He completed his sophomore year of high school and did not receive a GED. (R. 26.) He does drive "sometimes" but his girlfriend often drives him places, and she drove him to the hearing. (R. 25-26.)

At the time of the hearing, he had not worked for seven years and four months. (*Id.*) Foote's last job was as a truck driver, excavator, and operator of a dozer. (*Id.*) He testified that he tried working at the Salvation Army in Ottawa, where they had him cleaning toilets. (*Id.*) Foote testified that he was sent home after an hour and a half because he was in extreme pain from bending, twisting, turning, and lifting. (*Id.*) He did not try to find any other jobs. (R. 27.) He did not believe that he could do a job that would allow him to sit or stand if he wanted. *(Id.)*

Foote testified that since his car accident in April of 2009, his pain has gotten worse. (*Id.*) He stated that before the accident his pain was a 7-8 but that it was now a "strong ten" at night. (*Id.*) He can only sleep for 2-3 hours at night because of the pain. (R. 27-28.)

Foote explained that he had surgery in November of 2005, and he testified that he has "tried almost everything" as far as treatment with the exception of the electronic stimulation. (R. 28.)

Foote testified that for the past year and a half, his girlfriend has been doing most of the cooking, cleaning, laundry, and grocery shopping for him at his home, although she does not live with him. (R. 29.) Before that, he testified that he was on his own and most of the work would "pile[] up." (*Id.*) He was not able to recall the last time that he did any housework but he stated that before he met his girlfriend, he did his own laundry, which was located in the basement about 13 stairs down. (R. 30.) Foote

testified that his dad sometimes brings him groceries and he goes grocery shopping with his girlfriend. (R. 30-31.) He testified that he occasionally goes to the grocery store to get a couple of things by himself. (R. 31.) Foote is able to take care of his personal hygiene needs, except washing his back, and he is able to dress himself. (R. 32.) He is able to watch television, but frequently has to change position. (R. 33.) He also enjoys flying a remote control helicopter around the house. (*Id.*)

Foote testified that a typical day begins at around 2:30 or 3:00 am when the pain wakes him up. (R. 31.) He then sits at the table, walks around the house, sits in the recliner, and walks around the house again. (*Id.*) Eventually, he testified, he takes a nap for about 15 to 20 minutes. (*Id.*) He sometimes stays at home for four or five days at a time. (*Id.*) When he leaves the house, he goes to Brown's Tavern to have a few beers and socialize with friends. (R. 32.) He does this "probably every weekend." (*Id.*) Generally, Foote claims he is able to sit for about 15 to 20 minutes at a time, is able to walk around the house and out to the front porch to get the mail, as well as up and down the driveway. (R. 34.)

Following the surgery, Foote testified that he never felt as though he was getting better. (R. 35.) He claims that even after the surgery, "his throat collapses" and he feels "numb from almost ear to ear." (*Id.*) Since the 2002 accident, which he claims disabled him, he has experienced numbness and pain in his hands and arms that has gotten worse. (*Id.*) Foote stated that the medications helped him to a point, but he believes that he has taken them for so long that he has become immune to them. (*Id.*) He claims that he does not know how much relief they would give him, but that the medications would "numb [him] up pretty good," which would provide relief "for a while."

21

(R. 36.)  Foote testified that he experienced side effects such as more frequent trips to the bathroom and a "crabby" mood.  (*Id.*)  He also testified that he is still under the treatment of Dr. DePhillips and his chiropractor.  (*Id.*)

**D.  Vocational Expert Testimony**

Vocational Expert Gustlove ("the VE" or "VE Gustlove") testified at the September 17, 2009 hearing.  (R. 37-42.)  The VE testified that he had reviewed the file and is familiar with Foote's past work.  (R. 37.)  VE Gustlove also testified that he heard Foote's testimony.  (*Id.*)

The ALJ asked VE Gustlove to "assume exertional capacity limited to light work with the need for a sit/stand option where by sitting half the time and standing half the time.  No climbing of ladders, ropes or scaffolds.  Other postural functions could be performed occasionally.  The need to avoid environmental hazards such as unprotected heights and dangerous machinery."  (R. 38.)  Based on these conditions, the VE stated that Foote's past work would not be an option.  (*Id.*)  The VE testified that, assuming the hypothetical individual was Foote's age, education level, and work history, there would be no transferrable skills.  (*Id.*)

VE Gustlove testified that there are sedentary, unskilled jobs that such an individual could do, including toy stuffer, fishing reel assembler, and touch up screener for circuit boards.  (R. 38-39.)  The VE stated that these jobs could also have a sit/stand option and would only occasionally, if ever, have postural requirements.  (R. 39-40.)  The ALJ asked the VE to modify the lifting requirements of these sedentary jobs from ten pounds to five and asked if such a reduction would have an impact; the VE stated it would not.  (R. 40.)  VE Gustlove also testified that a restriction on overhead reaching

22

and other manipulative functions would also not affect these jobs. (*Id.*) The VE testified that employers for these positions would tolerate up to two absences per month, and if a potential employee would average more than that they "would probably rule out all employment opportunities." (*Id.*)

Foote's attorney asked whether these positions would have "production quota" requirements. (*Id.*) VE Gustlove responded that "there would be expectations... but you may have flexibility with that." (R. 41.) The ALJ then asked: "What percentage of time [would someone] have to stay on task to be able to meet the competitive work production standards of the employer?" (*Id.*) The VE responded that an employee would need to be on task at least 80 percent of the time. (R. 42.) VE Gustlove testified that the amount of time an employee is in a particular position - either sitting or standing - would not matter "as long as you can...maintain concentration on what you're doing." (*Id.*)

## II.    Legal Analysis

### A.    Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or

substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence...[and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

In order to qualify for DIB, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in

24

the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The

claimant has the burden of establishing a disability at steps one through four. *Zurawski*

*v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the

burden then shifts to the Commissioner to show that "the claimant is capable of

performing work in the national economy." *Zurawski*, 245 F.3d at 886.

The ALJ followed the five-step analysis in reaching his decision to deny Foote's

request for disability benefits. (R. 8-20.) At step one, the ALJ found that claimant had

not engaged in substantial gainful activity from the alleged onset of his disability, July 6,

2002 through the date last insured of December 31, 2007. (R. 13.) At step two, he

determined that through the date last insured, claimant had a severe impairment,

namely degenerative disc disease, status post cervical spine fusion. (*Id.*) He

concluded that this impairment caused significant limitations in the claimant's ability to

perform basic work activities. (*Id.*) At step three, the ALJ concluded that although

Foote suffered from a severe impairment, he did not have an impairment or combination

of impairments that met or equaled the criteria listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 ("Listing 1.04"). (R. 13-14.) In reaching this determination, he found that

claimant "did not have the requisite neurological deficits or other symptoms of a

disabling spinal disorder," and claimant was "able to perform fine and gross motor

movements effectively." (*Id.*)

Next, the ALJ found that through the date of last insured, the claimant had the

residual function capacity ("RFC") to perform unskilled sedentary work, except that

claimant was to avoid climbing ladders, ropes, or scaffolds. (R. 14.) In addition,

claimant could only occasionally climb ramps and stairs, balance, stoop, crouch, crawl,

25

or kneel.  (*Id.*)  The ALJ also concluded that claimant required work with a sit/stand option and lifting must be limited to no more than 5 pounds, with no overhead reaching and frequent use of manipulative function.  (*Id.*)

At step four, the ALJ reviewed Foote's RFC to determine whether he could return to his past work.  (R. 18.)  Based on this review, the ALJ concluded that claimant's RFC precluded him from returning to his past work.  (*Id.*)  At step five, relying on the Medical-Vocational Guidelines and considering Foote's age, education, work experience and RFC, the ALJ concluded that there were a number of jobs in the national economy that he would be able to complete.  (R. 18-20.)  Therefore, the ALJ found that Foote was not disabled within the meaning of the Act.  (*Id.*)

Foote now argues that the ALJ's decision was flawed.  First, Foote argues that the ALJ erred in analyzing the severity of claimant's impairment at step three.  Second, Foote argues that the ALJ erred in not accepting Dr. DePhillips' conclusion that claimant was disabled.  Third, claimant argues that the ALJ erred in assessing the effect of claimant's pain.  Finally, Foote argues that the ALJ did not consider all the factors in the RFC assessment.  We address each argument in turn.

### C. The ALJ Did Not Err in Analyzing Foote's Condition Under Listing 1.04A

Foote first argues that the ALJ erred in his analysis at step three in finding that claimant's impairment did not meet or medically equal an impairment under Listing 1.04A, which covers "Disorders of the Spine."  Foote contends that the ALJ did not consider Dr. DePhillips' finding that Foote suffered from nerve damage and that the ALJ did not conduct a serious review of the severity of claimant's impairment.  The Commissioner responds that although Dr. DePhillips cited some nerve damage, there is

no evidence in the record of the other requirements in Listing 1.04.

At step three, the ALJ must examine whether there are objective medical findings that correspond with one of the listed impairments.  The claimant "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing."  *Ribaudo v. Barnhart,* 458 F.3d 580, 583  (7th Cir. 2006).  Here, the ALJ concluded that although claimant had a severe impairment, he did not have an impairment or combination of impairments that met or equaled the criteria in Listing 1.04A because he was "lacking the neurological deficits or other symptoms of a disabling spinal cord disorder" and he "was able to perform fine and gross motor movements effectively."  (R. 14.)

We agree with the Commissioner that the ALJ did not error in making his findings at step three.  Listing 1.04A requires that for a finding of disability, claimant must show "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04.  Here, although Dr. DePhillips noted that Foote suffered from "persistent nerve root symptoms," claimant has not demonstrated any evidence of the requisite motor, sensory, or reflex loss in order to meet the criteria in Listing 1.04A.   Indeed, there are multiple instances in the record where it was noted that claimant did *not* suffer from these required conditions.  For example, Dr. Khan reported that Foote had mild limitation of motion, no muscle weakness or atrophy and no sensory loss.  (R. 244-45.)  Dr. Malek reported that Foote had no motor, sensory or reflex deficits and only a moderately restricted range of motion.  (R. 440-42.)  Dr.

Budzenski reported no muscle atrophy, no reflex or sensory loss, and good muscle strength. (R. 454-55). Dr. DePhillips even noted that Foote's motor strength was normal and there was no reflex or sensory loss. (R. 287-88.)

Claimant also relies on certain medical records that are dated after his date of last insured. However, any evidence that occurred after his date of last insured is not relevant to our discussion here. *See Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987) ("While we sympathize with the claimant and her physical problems and we realize that she was diagnosed as totally disabled..., these diagnoses simply are not relevant to her physical condition some eleven years earlier when her insured status expired"). For all of these reasons, we find that the ALJ did not error in making his findings regarding step three.

### D. **The ALJ Did Not Err in Rejecting the Treating Physician's Opinion**

Foote next argues that the ALJ erred in rejecting Dr. DePhillips' opinion that claimant was disabled and unable to work. Foote asserts that Dr. DePhillips' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." (Cl.'s Br. at 10-11.) The ALJ stated that Dr. DePhillips' opinion was "not supported by examination signs and clinical findings" and was inconsistent with the claimant's treatment, the objective findings of no neurological deficits, the claimant's reported activities of daily living, and the examinations of other physicians. (R. 18.)

It is well settled that a treating physician's opinion is entitled to "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory

28

diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Similarly, "medical opinions upon which the ALJ should rely need to be based upon objective observations and not amount merely to a recitation of claimant's subjective complaints." *Zblewski v. Astrue*, 302 Fed. Appx. 488, 493 (7th Cir. 2008); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)(if the treating physician's opinions appear to be "based solely on the patient's subjective complaints, the ALJ may discount it." (*quoting* 20 C.F.R. § 404.1527(d)(2))). Although a treating physician is thought to be in the best position to observe a claimant's condition over an extended period of time, his or her opinion may be unreliable "if the [physician] is sympathetic with the patient and thus too quickly find[s] disability." *Ketelboeter,* 550 F.3d at 625.

It is also well settled that "[a]n ALJ must minimally articulate her reasons for discounting a treating source's opinion." *Dampeer v. Astrue,* 826 F. Supp. 2d 1073, 1082 (N.D. Ill. Oct. 21, 2011) (internal quotations omitted). "This standard is 'a very deferential standard that we have, in fact, deemed lax.'" *Id.* (*quoting Berger v. Astrue*, 516 F.3d 539, 454 (7th Cir. 2008); *accord Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). "Once well-supported contradictory evidence is introduced, the treating physician's opinion is no longer controlling but remains a piece of evidence for the ALJ to weigh." *Dampeer,* 826 F. Supp. 2d at 1082.

First, we note that the determination of whether Foote is disabled for purposes of the Act is an administrative finding reserved for the ALJ, rather than a medical opinion. *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012). Moreover, we agree with

29

the ALJ that Dr. DePhillips' finding of disability is inconsistent with other evidence in the record. Foote complained of pain, but as the ALJ noted (and we discussed above), there is no evidence in the record that he suffered from the problems that are typically associated with disabling pain, such as significant limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensory loss or reflex abnormalities. Indeed, several other physicians (including other examining physicians such as Dr. Malek and Dr. Ghanayem) noted that Foote did not suffer from these ailments and could be released to light work duty. Even Dr. DePhillips' opined at times that Foote could return to work with limitations.

Foote argues that Dr. DePhillips' opinion was consistent with Dr. Kahn regarding his neck pain, Dr. Budzenski regarding his cervical spine motion and Dr. Kim regarding his MRIs. But none of these doctors opined that Foote was disabled. Although there might be some consistency on certain elements of Foote's medical condition, Dr. Kahn's opinion was that Foote suffered from only mild limitation of movement in his spine and had no sensory or reflex deficiencies. (R. 245.) Dr. Budzinksi made similar findings regarding Foote's condition, noting that Foote had no problems moving on and off the exam table, no personal hygiene issues and recommending that Foote return to light work duty. (R. 452-56.)

The ALJ also properly found that Foote's daily activities were inconsistent with Dr. DePhillips' opinion that Foote was disabled. In particular, the ALJ noted that for years before his girlfriend assisted him, Foote lived alone, he primarily took care of his own personal needs, he had little assistance with tasks associated with daily living (such as driving, grocery shopping and laundry), he regularly spent time socializing with

friends at the local tavern, and he was able to vacation in Cozumel, Mexico.

In support of his position, claimant again relies on findings from April of 2009 regarding undulating nerve roots. However, we do not consider these findings because, as stated previously, these occurred after claimant's date of last insured and are not related to the cervical spine injury reported in the application for DIB at issue here. *See Meredith*, 833 F.2d at 655.

Because the ALJ pointed to medical evidence that was "inconsistent or insufficiently objective," the ALJ provided "good reasons" for discounting Dr. DePhillips' opinion. *Zblewski*, 302 Fed Appx. at 493. Based on the foregoing, we find that the ALJ properly rejected the opinion of Dr. DePhillips.

### E. The ALJ Did Not Err in Assessing the Effect of Pain on Claimant

Foote next argues that the ALJ failed to properly assess claimant's pain when making his determination that claimant was capable of sedentary work. First, he bases his argument on two examinations by Dr. Ghanayem, which revealed tenderness, tightness, diminished sensation in the radial border of the forearm, and "a little bit of trouble with power grip on his right hand." Second, he claims that the ALJ did not consider the "non-exertional impairment of pain."

"When faced with a claimant alleging subjective symptoms, such as pain, an ALJ evaluates the credibility of the claimant's testimony." *Dampeer v. Astrue*, 2011 WL 5169448, at *9 (N.D. Ill. Oct. 31, 2011) (citing SSR 96-7p). Because the ALJ is in the best position to observe witnesses, his credibility finding will not be overturned as long as it has some support in the record. *Dixon*, 270 F.3d at 1178-79. "The ALJ must

31

consider the testimony in light of the entire record and be 'sufficiently specific' as to the reasons for his credibility determination." *Dampeer*, 2011 WL 5169448, at *9. However, courts are to give an ALJ's credibility determination a commonsensical reading, rather than "nitpick." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). An ALJ can discount a claimant's testimony on the basis of other evidence in the case, particularly because "[a]pplicants for disability benefits have an incentive to exaggerate their symptoms." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). In other words, the ALJ is not under any obligation to accept claimant's statements wholesale. *Johnson*, 449 F.3d at 805.

In finding that Foote was able to perform sedentary work, the ALJ found "claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the...[RFC]." (R. 16.) The ALJ explained that the medical evidence did not support Foote's subjective complaints. In particular, the ALJ noted that any "abnormal findings on clinical examination were generally limited to tenderness, tightness and decreased range of cervical motion," and the medical evidence did not demonstrate that Foote suffered from the usual symptoms associated with disabling pain, such as "significant limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensory loss or reflex abnormalities." (R. 17.) As we discussed above, we agree with the ALJ that there is plenty of medical evidence in the record that is inconsistent with Foote's complaints of disabling pain.

Aside from the medical evidence, the ALJ also noted Foote was able to perform

daily activities associated with independent living, such as personal hygiene, grocery shopping, doing his own laundry in the basement, and driving. He also referred to Foote's ability to travel to Cozumel, Mexico for a vacation, and his weekly visits to the local tavern. (R. 14-18.) The ALJ noted that although each of these factors are not always an indication that a claimant can work, in this case, looking at these factors in their entirety, there was no basis to conclude that Foote was completely disabled. *See, e.g., Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) ("the ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'"). We find that the ALJ did appropriately consider that Foote had some limitations, and rendered him capable of only sedentary work. Despite claimant's allegations of disabling pain, we agree that the ALJ's conclusions were "commonsensical" and "sufficiently specific" as to support this determination and therefore we will not remand on this basis. *Dampeer,* 826 F. Supp. 2d at 1083.

### F. The ALJ's RFC Assessment is Supported by Substantial Evidence

Finally, Foote argues that the ALJ did not consider all the factors in the RFC assessment that limited his ability to work. In particular, claimant relies on his subjective allegations of pain and Dr. DePhillips' findings, which we have already addressed above. The ALJ did agree that the claimant suffered from some restrictions, and as a result, he provided reasonable limitations based on his impairments. (R. 17.) For all the reasons stated above, we find that the ALJ has built the requisite "logical bridge" in making his disability determination.

33

## III.  CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is

denied and the Commissioner's cross motion for summary judgment is granted.  It is so

ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: September 7, 2012**